IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| MARY L. BROCKHOFF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 06-0151-CV-W-ODS |
| | ) |
| SHERIFF PAUL VESCOVO, et al., | ) |
| | ) |
| Defendants. | ) |

ORDER AND OPINION (1) GRANTING IN PART AND DENYING IN PART
DEFENDANT RICH GAUERT'S MOTION FOR SUMMARY JUDGMENT, (2)
GRANTING IN PART REMAINING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND (3) DISMISSING REMAINING CLAIMS WITHOUT PREJUDICE

Pending are motions for summary judgment filed by Defendants. One motion (Doc. # 77) was filed on behalf of Rich Gauert; this motion is denied with respect to Counts I and VII and granted in all other respects. The second motion (Doc. # 86) is filed on behalf of the remaining defendants; this motion is granted with respect to Counts I through IV and the remaining counts are dismissed without prejudice.

I. BACKGROUND

In Februay 2004, Rich Gauert was a Deputy with the Clay County Sheriff's Office and was assigned to work undercover as a member of the Clay County Drug Task Force. On or about February 25, 2004, Gauert received a report about suspected illegal drug activity involving a particular residence in Clay County, Missouri. The residence in question belonged to Plaintiff. He took the information to a meeting that included members of the Clay County Drug Task Force and officers from the Kansas City, Missouri, Police Department. At some point, Sergeant John Teale (Gauert's supervisor on the Task Force) determined he would conduct a "knock and talk" at Plaintiff's home. Gauert and his partner, Deputy Philip Coffer, were working undercover so they were not to participate directly in the "knock and talk." Instead, they were to take a position in a

parking lot behind Plaintiff's house to see if anyone attempted to leave the residence. At approximately 9:00 p.m., Gauert and Coffer arrived at the parking lot in an unmarked car and parked facing away from Plaintiff's house.

Plaintiff saw the headlights in the parking lot behind her house. She suspected her estranged husband had hired detectives to watch her and believed the car in the parking lot was one of those detectives. She decided to go to the parking lot and photograph the car's license plate.

Before the "knock and talk" occurred, Gauert received word that Plaintiff was driving towards his location. Shortly thereafter, a 2001 GMC Yukon owned by Plaintiff pulled into the parking lot. The vehicle was driven by Eric Cheney (Plaintiff's daughter's boyfriend) and Plaintiff was in the passenger seat. Cheney stopped the car behind the undercover police car and the Yukon's headlights shone into the deputies' car. Gauert and Coffer exited their vehicle; Gauert from the driver's side and Coffer from the passenger's side. Both men had their guns drawn. Gauert walked past the Yukon's driver's side door and took a position behind the vehicle, and Coffer took a position by the front quarter panel on the passenger's side. Gauert did not identify himself as a law enforcement officer. Coffer testified that he identified himself as a law enforcement officer, but Plaintiff and Cheney testified they did not hear him (perhaps because the Yukon's windows were up). Upon seeing the men with guns in their hands, Plaintiff became afraid and yelled "Oh my God, Eric, they've got glocks, they are going to kill us; drive."

The subsequent sequence of events is subject to significant factual dispute. It is not the Court's role to resolve these disputes, but rather to view them in the light most favorable to Plaintiff. Viewed in that light, the Record suggests Cheney accelerated rapidly in an attempt to exit the parking lot. Gauert was in a position to see his partner. Gauert fired at the fleeing Yukon, even though the Yukon was not in a position to hit either of the deputies. For his part, Gauert contends he fired at the Yukon's driver because he was afraid the driver was trying to hit Coffer.

Regardless of the sequence of events or the parties' motivations, there is no doubt that Gauert fired approximately three shots at the Yukon, that his shots struck the

Yukon, but neither Plaintiff nor Cheney were hit. Coffer testified he was initially unaware who had fired the shots, and issued a radio report indicating shots had been fired and the direction the Yukon had fled. Almost immediately after making the report, Coffer learned the shots were fired by Gauert and not the Yukon's occupants; however, he did not make a radio announcement clarifying this point. The deputies got back in their car and started to pursue the Yukon, but (for reasons that are disputed) turned around and returned to the parking lot.

Meanwhile, Teale observed the Yukon turn out of the parking lot and run a stop sign and travel past a Kansas City Police cruiser. He moved his vehicle in an attempt to block the vehicle, exited his car and shouted "Sheriff's Department, Sheriff's Department" in an attempt to get the Yukon to stop. His effort was unsuccessful.

Shortly thereafter, officers from the Kansas City Police Department stopped the Yukon. Plaintiff and Cheney were removed from the vehicle, handcuffed, and placed in a patrol car. Teale asked Plaintiff if she knew what was going on and advised her that Gauert and Coffer were undercover law enforcement agents. To date, this was the only interaction between Teale and Plaintiff.

Plaintiff eventually signed a consent form authorizing the search of her home by law enforcement officers. The search revealed methamphetamine and marijuana in Plaintiff's bedroom, and Plaintiff now concedes the drugs belonged to her. Criminal charges were filed against Plaintiff in Clay County Circuit Court, but those charges were later dismissed.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

3

248 (1986); see also Get Away Club, Inc. v. Coleman, 969 F.2d 664 (8th Cir. 1992). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The defendants in this case are (1) Paul Vescovo, the Sheriff of Clay County, (2) the Clay County Drug Task Force, (3) Clay County, Missouri, (4) Sergeant Teale, (5) Deputy Gauert, and (6) Deputy Coffer. The four individuals are named in their official and individual capacities; however, apart from Sheriff Vescovo, the individuals do not have an official capacity and no claims are made against them in that role. Therefore, the Court's focus will be on their personal actions.

Several Defendants assert the defense of qualified immunity. The initial inquiry in analyzing this defense is whether the facts, construed in the Plaintiff's favor, show the officer's conduct violated a constitutional right. Only if this inquiry is answered affirmatively does the Court need to consider whether that right was clearly established. E.g., Saucier v. Katz, 533 U.S. 194, 201 (2001).

## A. Count I – Excessive Force

A critical point that must be remembered is Count I challenges the force employed and specifically addresses the shots fired by Gauert. Count I does not challenge the police department's stopping of the Yukon, her placement in handcuffs, or any other event subsequent to the shooting.

4

## 1. The Applicable Constitutional Provisions

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Id. Plaintiff contends her claim should be analyzed under the Fourth Amendment; barring that, she contends her claim should be analyzed under the Fourteenth Amendment.[1] The Court rejects her primary position, but agrees with her secondary position.

Gauert's shots could not violate the Fourth Amendment unless they constituted a seizure, and a seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." Brower v. County of Inyo, 489 U.S. 593, 596-97 (1989) (emphasis in original). A seizure also occurs when physical contact is made even if it is unsuccessful in stopping the person's movement, but otherwise an "attempted seizure" does not implicate the Fourth Amendment. Cf. California v. Hodari D., 499 U.S. 621, 626-27 & n.2 (1991). In short, "[a]n arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." Id. at 626; see also Schulz v. Long, 44 F.3d 643, 647 (8th Cir. 1995).

Decisions from the Court of Appeals clarify these concepts through application. In Cole v. Bone, a motorist led law enforcement on a high-speed chase. The motorist sped through a toll booth and refused to stop when signaled by a state trooper. Troopers attempted a "rolling roadblock," which failed. A trooper then shot at the vehicle's wheels and flattened one of the tires, but the chase continued. A stationary roadblock was set up, but the driver ran the roadblock; as he did so, troopers fired at the vehicle's tires and flattened another of them. Eventually, a trooper shot at and killed the driver. 993 F.2d 1328, 1330-31 (8th Cir. 1993). The Eighth Circuit determined the driver

---

[1] Plaintiff does not suggest that her claim should be analyzed under the Eighth Amendment, so the Court will follow suit and not consider that possibility.

5

"was not seized until he was struck by the shot from Trooper Rice's revolver. . . [T]he shots that were fired at the truck and that did not hit Cole were not seizures because they . . . failed to produce a stop. Nor did the unsuccessful rolling roadblock and stationary roadblock constitute seizures. . . . In short, all of these actions constituted assertions of authority by the officers, but they were not seizures under the Fourth Amendment because Cole did not submit to any of them, nor did any succeed in stopping him." Id. at 1333. Gauert's shots hit the Yukon, but they did not hit Plaintiff and they did not cause Plaintiff to stop or otherwise yield to Gauert's authority. Therefore, these shots – like those that flattened the tires in Cole – do not constitute a seizure.

Plaintiff finds support in Ludwig v. Anderson. In that case, officers responded to a report of a person who appeared to be emotionally disturbed. The man hid his hands under his poncho and ignored commands to show his hands. He also refused to get into a squad car. He was sprayed "in the chest" with mace but continued walking away from officers. Eventually, the man pulled out a knife, and officers drew their guns. The man then turned and ran up a hill and stopped, claiming to be tired. An officer (Anderson) in a car decided to stop the man with his car; "his car was almost stopped, but still moving, when it hit" the man; estimates indicated the car was moving ten to fifteen miles per hour. The attempt to stop the man failed, as he managed to spin away; officers then surrounded the man. He continued to ignore their commands, and he was maced. The man attempted to run away, at which point one officer shot him with his handgun and another shot him with a shotgun. 54 F.3d 465, 467-69 (8th Cir. 1995). The Court of Appeals discussed Cole and Hodari D. and based on those cases concluded

> that Ludwig was twice seized in a potentially unreasonable manner: first, when Anderson attempted to hit Ludwig with the squad car, and second, when Ludwig was ultimately shot. Although the police may be said to have seized Ludwig by twice applying mace (i.e., applying physical force although unsuccessful), we hold that they violated no clearly established right by macing Ludwig.

6

Id. at 471. Plaintiff emphasizes that the attempt to stop Ludwig with the squad car failed, which is true: however, Plaintiff ignores the fact (discussed earlier) that the squad car physically struck Ludwig. The effort to use the squad car would have been analyzed differently if Ludwig had not been struck; however, he was struck by the car, so this attempt to stop him qualified as a seizure even though it was unsuccessful.

In a final effort to invoke the Fourth Amendment, Plaintiff argues Gauert's use of force eventually led to her seizure by the police. This argument ignores the analysis employed in the cases cited above, which requires a focused examination to determine which incidents in a chain of events constitute a seizure. The existence of a seizure (here, the stopping of the vehicle and the handcuffing of Plaintiff by the police) does not transform all events in the preceding chain of events into a seizure.

Plaintiff did not yield to Gauert, and Gauert did not cause physical contact with Plaintiff in an unsuccessful attempt to stop her. Therefore, the Fourth Amendment does not apply to Gauert's shooting, and the next step is to consider whether the Fourteenth Amendment applies. Cf. County of Sacramento v. Lewis, 523 U.S. 833, 843-44 (1998). Governmental conduct violates the Fourteenth Amendment if it is so egregious and outrageous that it "shocks the conscience." Id. at 847 & n.8. Mere negligence is insufficient to satisfy this standard; instead, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849. "[I]n rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation, a state actor's action will shock the conscience only if the actor intended to cause harm." Neal v. St. Louis County Bd. of Police Comm'rs, 217 F.3d 955, 958 (8th Cir. 2000).

Viewing the facts in the light most favorable to Plaintiff, the Court concludes there is evidence that, if believed by the jury, would support a finding Gauert's actions violated the Fourteenth Amendment. There is evidence that could cause a jury to believe Coffer was not in any danger, that Plaintiff knew Coffer was not in any danger, and that the Yukon was well-past both deputies when Gauert began shooting. There was no reason to think the Yukon's occupants were dangerous, nor was there any reason to think they

7

had violated the law. Nonetheless, Gauert shot at them.[2] Even if Gauert was entitled to believe the Yukon's occupants knew he and Coffer were law enforcement officers (another fact that is subject to dispute), he was not entitled to shoot them just because they drove away. While such conduct may have been commonplace in the mythical "wild west," a jury's conscience could be shocked by an officer's shooting at people who drive away from police.

### 2. Who Can Be Liable?

Gauert fired the shots, so Gauert is obviously a potential defendant. Plaintiff insists that other Defendants are responsible for her seizure, but does not suggest that any of them employed excessive force. None of the other individuals fired the shots or did anything else that can be characterized as the administration of excessive force, so none of the other individuals can be liable in their individual capacities. The liability of the governmental entities and Sheriff Vescovo in his official capacity are asserted in Count IV, not in Count I, so they cannot be liable here. The only party potentially liable for the Fourteenth Amendment violation asserted in Count I is Gauert.

### 3. Qualified Immunity

Having determined a jury could conclude Gauert violated Plaintiff's Fourteenth Amendment rights, the Court must determine whether the right was clearly established; that is, whether the right would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "[T]he nonmoving party is still given the benefit of all relevant inferences at the summary judgment stage, and if a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that

---

[2]For his part, Gauert emphasizes his belief that the shooting was necessary to protect his partner. The jury is not obligated to believe this version of events, and the Court is not empowered to resolve the factual dispute.

8

ground." Plemmons v. Roberts, 439 F.3d 818, 822 (8th Cir. 2006) (internal quotations omitted).

Gauert's entitlement to qualified immunity depends upon the sequence of events that led to the shooting, and the Record does not conclusively establish what happened. Because the facts related to qualified immunity are the same disputed facts that the jury must consider in assessing liability, the Court cannot determine Gauert is qualifiedly immune.

## B. Count II – Wrongful Arrest

Plaintiff avers that two officers from the Kansas City Police Department – Officer Christopher Smith and his partner – arrested her and Cheney when they stopped the Yukon, removed them from the car, placed them in handcuffs, and put them in a patrol car. Doc. # 111 at 40-41. Neither Smith nor his partner are defendants in this case. Nonetheless, Plaintiff contends Defendants are legally responsible for what she characterizes as the "wrongful arrest." The Court disagrees.

First, as previously discussed, the only seizure that occurred was when Officer Smith and his partner caused the Yukon to stop. Plaintiff and Cheney yielded to their authority (apparently, the lights on the squad car) and stopped: this became a seizure. Plaintiff and Cheney did not yield to anyone else's authority, nor was physical contact made by any of the Defendants. Since none of the Defendants seized or arrested Plaintiff, they could not have done so wrongfully.

With respect to Gauert and Coffer, Plaintiff contends they "caused her arrest." She reasons that if they had not drawn their guns, Plaintiff and Cheney would not have panicked and fled. The Court has found no legal support for this novel theory. Plaintiff does not question that Officer Smith and his partner had probable cause to arrest her – she was in a car that, at a minimum, was speeding and ran through a stop sign. This seems to undercut Plaintiff's entire argument, as her arrest was not even "wrongful." Plaintiff's argument seems to be that anyone who caused her to act an a way that presented probable cause to the arresting officers is legally responsible for the arrest,

9

but she points to no case law supporting this theory – and the Court concludes it is not a viable theory. In any event, even if the theory is viable, the lack of case law to support it demonstrates Deputies Gauert and Coffer are entitled to qualified immunity because it could not have been clear to them that they were violating Plaintiff's rights by approaching her with guns drawn, thereby causing her to flee and resulting in her arrest by other officers.

Plaintiff emphasizes that she and Cheney did not have the intent to harm anyone, had not committed an assault, and (at the time they were stopped by the police) no evidence of drugs had been uncovered. All this may be true, but the arresting officers saw Cheney run a stop sign and saw Cheney speeding. This presented probable cause to stop the Yukon and handcuff the occupants. Plaintiff also discusses a great deal of post-arrest conduct, but none of it bears on whether the arrest itself was wrongful or justified.

Plaintiff also contends Teale was responsible for her later arrest on drug charges because he directed another law enforcement officer to seek her consent to search her home. Asking a person for consent to search does not constitute an arrest and is not wrongful conduct. The search uncovered drugs in Plaintiff's bedroom, and while the charges were dismissed after the preliminary hearing (because the state court determined there was not probable cause to connect Plaintiff to the drugs),[3] this does not mean probable cause to arrest was absent.

Plaintiff's arrest was not unlawful, so none of the Defendants can be liable for a wrongful arrest. Summary judgment is granted to all Defendants on Count II.

---

[3]Despite this determination, in the context of this case (as noted earlier), Plaintiff concedes the drugs were hers. In light of the state court's determination the Court rejects Plaintiff's repeated invitation to infer that the case was dismissed because the drugs were unlawfully seized.

10

C. Conspiracy

Count III alleges Gauert and Coffer conspired to deprive Plaintiff of her constitutional rights. This claim focuses on Gauert's initial radio report that shots had been fired without clarifying – either then or shortly thereafter – that the shots were fired by Gauert. This left other law enforcement officers with the false impression that the shots were fired by one of the Yukon's occupants.

To establish a conspiracy under section 1983, the plaintiff must demonstrate "that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." Gunter v. Morrison, 497 F.3d 868, 873 (8th Cir. 2007) (quotation omitted). Absent a constitutional violation, there can be no actionable conspiracy. E.g., Slusarchuk v. Hoff, 346 F.3d 1178, 1183 (8th Cir. 2003), cert. denied, 541 U.S. 988 (2004).

One difficulty with Plaintiff's claim is ascertaining the nature of the alleged conspiracy or agreement to deprive her of her constitutional rights. Gauert and Coffer did not agree that Gauert would shoot at her. The undisputed circumstances demonstrate that Gauert and Coffer did not discuss, much less agree, on the contents of Coffer's post-shooting broadcast. Plaintiff is left, then, to argue that Gauert and Coffer agreed that (1) Coffer's initial broadcast was misleading and (2) neither of them would issue a corrective broadcast. However, she has no proof of this, and the only way a jury could credit this theory is for the jury to speculate. Plaintiff insists that Gauert and Coffer had a lot of time to discuss the events before other law enforcement officers joined them in the parking lot. This is true, but there is no evidence that would support a jury's finding that the two of them discussed how to "cover up" their alleged wrongdoing, much less a finding that they discussed and rejected the idea of broadcasting more accurate information about the shooting.

The second problem is determining that a constitutional violation even occurred. As stated previously, the seizure of Plaintiff was lawful regardless of the radio report, so the radio report did not lead to her seizure. At best, the report may have resulted in

11

Plaintiff being handcuffed instead of merely being stopped, but either way she would have been seized.

### D. Monell Claims

In Count IV, Plaintiff asserts a *Monell*[4] claim against Sheriff Vescovo, the Clay County Drug Task Force, and Clay County. A *Monell* claim imposes liability upon a municipality or similar governmental entity only if the municipality itself caused the constitutional injury. A theory of respondeat superior is insufficient for liability to attach; a municipality causes the deprivation only if the deprivation occurs pursuant to an official policy or custom. See Monell, 436 U.S. at 694-95. In this case, Plaintiff alleges the three defendants had customs or policies of failing to train officers (1) to avoid use of excessive force, (2) to properly conduct undercover investigations, and (3) "to truthfully report occurrences rather than to falsify information to cover up misconduct." The Complaint also alleges the defendants had a policy or custom of (1) "covering up police misconduct by falsifying and fabricating evidence without regard to whether the policies, practices and customs might result in the unlawful arrest, prosecution or conviction of innocent persons and (2) being "deliberately indifferent" to violations of constitutional rights. Complaint, ¶ 48.

The undisputed facts demonstrate defendants are entitled to summary judgment with respect to the three "failure to train" claims. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). The failure to train can be considered a deliberate policy choice – as required by *Monell* – only if the municipality acts with deliberate indifference. Id. at 389-90. It is not enough for the plaintiff to demonstrate the municipality is responsible for the policies actually employed and invite the jury to infer the failings or inadequacies were deliberate choices. Id.

---

[4]Monell v. Department of Social Services, 436 U.S. 658 (1978).

12

Proving deliberate indifference requires the plaintiff to prove the municipality knew its procedures were inadequate and likely to result in a violation of constitutional rights. E.g., Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir. 1996). Notice can be implied in two circumstances. First, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to be deliberately indifferent to the need." Id. at 390. Second, a pattern of prior misconduct may be sufficient to indicate the municipality's response to a regularly recurring situation is inadequate to prevent it. Jennings v. Wentzville R-IV School Dist., 397 F.3d 1118, 1122 (8th Cir. 2005); Thelma D. v. Board of Ed. of City of St. Louis, 934 F.2d 929, 932-33 (8th Cir. 1991).

Plaintiff expressly eschews any reliance on the second theory – which is just as well, as she does not suggest facts that will substantiate a pattern of misconduct that would put Defendants on notice that their training was inadequate. Instead, she contends that officers are placed in situations in which training is obviously required. While true, this is not enough to show that the training actually provided was inadequate – even if Plaintiff can demonstrate a constitutional violation occurred. In the absence of a pattern sufficient to put the municipality on notice, and allow the jury to infer, that the training was inadequate, Plaintiff is obligated to affirmatively demonstrate shortcomings or inadequacies in the training. E.g., Robinette v. Jones, 476 F.3d 585, 591 (8th Cir. 2007); Grayson v. Ross, 454 F.3d 802, 811 (8th Cir. 2006). Plaintiff has not done this: she relies only on the alleged violations in this case and argues that additional training

13

Case 4:06-cv-00151-GAF    Document 128    Filed 05/21/08    Page 13 of 18

was needed because they occurred.[5]  This is not enough to demonstrate deliberate indifference.

Plaintiff offers no explanation – either legal or factual – about her claims that Defendants had a policy, custom or practice of falsifying evidence or being indifferent to constitutional violations.  Even if these are accurate descriptions of events in *this* case, the Record would not support a conclusion that it happens enough for there to be a *de facto* policy, custom or practice of doing so.

### E.  State Law Claims

Diversity of citizenship is lacking, so there is no independent basis for federal jurisdiction over Plaintiff's state law claims.  The Court can exercise supplemental jurisdiction over the state law claims if they "are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, the Court can "decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction.  Id. § 1367(c)(3).  While this is a discretionary decision, "the balance of interests will usually point toward declining to exercise jurisdiction over the remaining state law claims."  In re Canadian Import Antitrust Litigation, 470 F.3d 785, 792 (8th Cir. 2006) (quotations omitted).  The Court also has discretion to decline to exercise supplemental jurisdiction if "there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c)(4).

---

[5]Plaintiff also faults Defendants for not having a program of remedial training for those who violate the law or rules, but the alleged lack of such training did not cause Plaintiff's injuries.  The lack of remedial procedures would be relevant if Gauert had engaged in this misconduct in the past, but that is not Plaintiff's allegation.  She asserts Gauert once engaged in a high speed pursuit while he was "emotionally out of control," but this is not the same situation.  Even if the prior incident were comparable, Plaintiff has not suggested how any remedial training employed was deficient as required by Robinette and Grayson.

14

Only one Defendant – Gauert – remains with respect to any of Plaintiff's federal claims. The claims against the other defendants depend significantly on events that occurred after, and are distinct from, those at issue in the remaining federal claim. Even if those factual situations are sufficiently connected to Gauert's use of his firearm, the Court declines to exercise supplemental jurisdiction over them because there is no reason to complicate the federal proceeding with state law claims involving defendants and facts that are not involved in the sole federal claim. With that in mind, the Court dismisses without prejudice the state claims against all Defendants other than Gauert. The state claims against Gauert will be addressed on the merits.

### 1. Count V – False Arrest

Count V asserts a claim for false arrest. Assuming without deciding that a false arrest occurred, the undisputed facts demonstrate Gauert cannot be liable for that tort. "False imprisonment, also called false arrest, is the confinement, without legal justification, by the wrongdoer of the person wronged. A person can be liable for false imprisonment if he encourages, causes, promotes, or instigates the arrest." Highfill v. Hale, 186 S.W.3d 277, 280 (Mo. 2006) (en banc) (quotation omitted). Plaintiff does not suggest Gauert was directly involved in her arrest, but contends he is liable because he failed to tell the arresting officers that he fired the shots referenced in Coffer's radio report. While reporting false information with the intent of bringing about an arrest may be liable for false arrest, id. at 280-81, the law does not impose liability on someone who does not report information to the police, regardless of the reason they remain silent. Gauert did not cause, encourage, promote, or instigate Plaintiff's arrest; at worst, he remained silent while it happened.[6] This is insufficient to create tort liability. Cf. L N.H v. Wells, 705 S.W.2d 488, 492 (Mo. Ct. App. 1985).

---

[6] The Record also does not provide any basis for the jury to conclude Gauert knew the content of Coffer's radio report, which precludes a finding that Gauert had the necessary intent. In light of the Court's discussion, there is no need to explore this issue further.

15

### 2. Count VI – Abuse of Process

The elements for the tort of abuse of process are (1) the defendant made an illegal, perverted, improper use of process that is neither warranted nor authorized, (2) the defendant had an improper purpose, and (3) damage resulted. Rittersbuch v. Holt, 789 S.W.2d 491, 493 (Mo. 1990) (en banc). "The essence of abusive process is not the commencement of an action without justification, but it is the misuse of process for an end other than that which it was designed to accomplish." Guirl v. Guirl, 708 S.W.2d 239, 245 (Mo. Ct. App. 1986). Plaintiff contends Gauert is liable because he testified at the preliminary hearing. She also alleges Gauert's conduct somehow led to her consent to the search of her home, which in turn led to the filing of charges against her. However, she does not contend that he caused the prosecution that led to the preliminary hearing. In any event, Plaintiff does not explain how Guaert (or anyone) had an illegal, perverted, improper, or illegal motive or purpose when they acted; the discovery of narcotics in Plaintiff's home presented a legitimate motive for the prosecution.

### 3. Count VII – Assault

There are disputed issues of fact that preclude summary judgment on this claim. In particular, the factual disputes that create a submissible case on Count I also create a submissible case against Gauert on Count VII. Also, the same issues that preclude judgment for Gauert on his claim of qualified immunity on Count I preclude judgment for Gauert on his claim of official immunity on Count VII.

### 4. Count VIII – Negligence

Plaintiff contends Gauert violated his duties "to conduct a reliable and responsible investigation, to lawfully procure evidence, and to make arrests only if probable cause is established. Gauert made no attempts to verify the information . . .

16

### 2. Count VI – Abuse of Process

The elements for the tort of abuse of process are (1) the defendant made an illegal, perverted, improper use of process that is neither warranted nor authorized, (2) the defendant had an improper purpose, and (3) damage resulted. Rittersbuch v. Holt, 789 S.W.2d 491, 493 (Mo. 1990) (en banc). "The essence of abusive process is not the commencement of an action without justification, but it is the misuse of process for an end other than that which it was designed to accomplish." Guirl v. Guirl, 708 S.W.2d 239, 245 (Mo. Ct. App. 1986). Plaintiff contends Gauert is liable because he testified at the preliminary hearing. She also alleges Gauert's conduct somehow led to her consent to the search of her home, which in turn led to the filing of charges against her. However, she does not contend that he caused the prosecution that led to the preliminary hearing. In any event, Plaintiff does not explain how Guaert (or anyone) had an illegal, perverted, improper, or illegal motive or purpose when they acted; the discovery of narcotics in Plaintiff's home presented a legitimate motive for the prosecution.

### 3. Count VII – Assault

There are disputed issues of fact that preclude summary judgment on this claim. In particular, the factual disputes that create a submissible case on Count I also create a submissible case against Gauert on Count VII. Also, the same issues that preclude judgment for Gauert on his claim of qualified immunity on Count I preclude judgment for Gauert on his claim of official immunity on Count VII.

### 4. Count VIII – Negligence

Plaintiff contends Gauert violated his duties "to conduct a reliable and responsible investigation, to lawfully procure evidence, and to make arrests only if probable cause is established. Gauert made no attempts to verify the information . . .

that Brockhoff might be involved in drug activity." Plaintiff's Suggestions in Opposition (Doc. # 111) at 55; see also Complaint, ¶ 60. However, Gauert did not procure any evidence or make any arrests, so even if such duties exist and a negligence claim is legally viable, Gauert cannot be liable. Finally, Gauert did not do anything that required further verification of the information about Plaintiff's alleged drug activity: law enforcement does not need any particular degree of suspicion to initiate a consensual encounter, much less to park an unmarked car in a parking lot.

### 5. Count IX – Malicious Prosecution

"To state a claim for malicious prosecution, the plaintiff must plead and prove six elements: (1) commencement of an earlier suit against plaintiff; (2) instigation of the suit by defendant; (3) termination of the suit in plaintiff's favor; (4) lack of probable cause for the suit; (5) malice by defendant in instituting the suit; and (6) damage to plaintiff resulting from the suit." Edwards v. Gerstein, 237 S.W.3d 580, 582 (Mo. 2007) (en banc). Gauert is entitled to summary judgment for several reasons, most notably because the uncontroverted evidence demonstrates he did not instigate the criminal prosecution. Reporting information to prosecutors who independently elect to file charges does not constitute instigation of proceedings. E.g., Rankin v. Venator Group Retail, Inc., 93 S.W.3d 814, 819-21 (Mo. Ct. App. 2002). Plaintiff also has not identified any evidence that would permit a jury to conclude (without speculation) that Gauert had an improper motive. Finally, the uncontroverted facts demonstrate there was probable cause supporting the decision to charge Plaintiff; even though the state judge found probable cause to proceed to trial was lacking, this does not mean there was no justification to institute that proceeding. The fact that drugs were found in Plaintiff's bedroom provided justification for bringing the charges.

17

## III. CONCLUSION

For these reasons, summary judgment is granted to Defendants on Counts I through IV, except with respect to Defendant Gauert on Count I. Counts VI through IX are dismissed without prejudice except as to Defendant Gauert. Summary judgment is denied on Count VII with respect to Gauert, and granted on Counts VI, VIII and IX with respect to Gauert.
IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: May 21, 2008        UNITED STATES DISTRICT COURT